# North American Land Company's Estate.
## Lawrence's Appeal.    Phillips's Appeal.

A land company was organized by Morris, Nicholson and Greenleaf. Its lands were represented by shares of stock. Greenleaf sold his shares in the company to Morris and Nicholson, and received their obligations in payment of the same, the shares to be retained by Greenleaf to secure the payment of these obligations. Before their maturity, Greenleaf by deed conveyed certain property to Simpson, in trust, to secure the payment of these obligations that he had passed to different parties, and later assigned the shares to Pratt et al., successors of Simpson, in this trust; subsequently a deed was made by Greenleaf of the first part, Fox of the second part, Morris and Nicholson of the third part, and Pratt et al. of the fourth part. In this it is recited that Pratt et al. hold notes of Morris and Nicholson, in trust, for the creditors of Greenleaf, and that certain trusts were created to secure the same, and that the deed is made to better secure those debts, and conveys certain property to form an aggregate fund for the payment of certain obligations. The trustees in this deed became the holders of obligations referred to in the first deed. The fund for distribution is the amount that the shares transferred to Pratt et al. were entitled to from the sale of the lands of the land company: Held, that Pratt et al., trustees in the Aggregate Fund Deed, were entitled to the fund.

February 19th and 20th 1877. Before Agnew, C. J., Sharswood, Mercur, Gordon, Paxson and Woodward, JJ. Williams, J., absent.

Appeals from the Court of Common Pleas, No. 1, of *Philadelphia county* : Of January Term 1875, Nos. 139 and 144½.

These were the appeals of Henry Phillips, Jr., administrator *d. b. n. c. t. a.* of the estate of Robert Morris, deceased, and Edward S. Lawrence, administrator *de bonis non* of John Nicholson, deceased from the decree of the court confirming the reports of the auditor made in the matter of the account of the Pennsylvania Company for Insurance on Lives and Granting Annuities, substituted trustees,

by appointment of the Court of Common Pleas, of the estate known
as "The 381 Trust."

The fund in the hands of the accountant for distribution arises
from the sum of $42,343.48, received December 3d 1862, from
James Dundas, as surviving trustee of the North American Land
Company, being a dividend on 6119 shares of stock in said company,
awarded to James Dundas, deceased, the immediate predecessor of
the accountant in the trust, by the decree of the Court of Common
Pleas for the city and county of Philadelphia, on the 6th day of
July 1861, confirmed by the Supreme Court of Pennsylvania, on
the 8th day of November 1862 ; the opinion of the latter court being·
reported in 7 Wright 23.

The material facts of the case as disclosed by the report of the
auditor, Furman Sheppard, Esq., may be stated as follows :—

On the 20th day of February 1795, Robert Morris, John Nicholson
and James Greenleaf established an unincorporated association, by
the name and style of "The North American Land Company."

The founders above named being the owners of lands in the states
of Pennsylvania, Virginia, North Carolina, South Carolina, Georgia
and Kentucky, vested the titles thereof in three trustees, in trust, to
convey the same agreeably to the written articles of association.
The capital stock of the company is described by the articles as
consisting of 6,000,000 of acres of land, situate in the states above
named, which were represented by 30,000 shares of 200 acres each.
Every owner of a share was to become and be a member of the
company during the period of his ownership of the shares, to all
intents and purposes as if he had signed and sealed the articles of
association.   In the 23d section of the articles, Morris, Nicholson
and Greenleaf agree that the dividend or dividends of the company
shall not be less then six per cent. per annum in every year, and
in case the cash arising from sales of the land does not amount to
that sum, they promise and bind themselves, their heirs, executors
and administrators to advance and lend to the board of managers
of the company such sum as may be necessary in addition to what
they have in hand of the company's money, to enable them to pay
$6 on each share, and to secure this undertaking, Morris, Nicholson
and Greenleaf agree each to deposit in the hands of the trustees
3000 shares, making 9000 shares in all.   It seems, however, that only
4,479,317¼ acres of land were conveyed by Morris, Nicholson and
Greenleaf to the trustees, which, in the proportion of one share for
every 200 acres, were represented by 22,365 shares, which was the
whole number issued.    These shares were issued in equal proportions
to each of the three founders, being 7455 shares to each.    A corre-
sponding reduction was also made in the number of shares deposited
with the trustees by the founders to secure the six per cent. divi·
dends, each founder depositing 2485 shares instead of 3000 shares.
Subsequently, on May 28th 1796, by articles of agreement entered

into between James Greenleaf of the one part, and Robert Morris and John Nicholson of the other part, Greenleaf sold to Morris and Nicholson, their heirs and assigns, equally as tenants in common, his whole interest in the North American Land Company, for the sum of $1,150,000, one-half of which sum was to be paid in negotiable orders drawn by Morris on Nicholson, payable to the order of Greenleaf and accepted by Nicholson, and to bear date May 28th 1796.  The other half of said consideration was to be paid in orders of like date drawn by Nicholson on Morris to the order of Greenleaf and accepted by Morris.  These orders were payable respectively in one, two, three and four years from date, and they were to be drawn for amounts particularly specified in the articles of agreement, which further declare that " for securing the punctual payment of all the said orders, it is agreed that the said James Greenleaf shall not be obliged to make transfer to the said Morris and Nicholson of the shares in the said Land Company, hereby agreed to be sold, until the said, orders are paid," &c.

Subsequent to the making of the foregoing agreement, many of the notes and engagements of Morris and Nicholson given to Greenleaf, in pursuance of said agreement, were pledged by the latter, or by others by his direction, to sundry persons, as a security for the performance of his own engagements and the engagements of other persons entered into upon his account, and several of said orders, notes and engagements were by an indenture, bearing date September 30th 1796, assigned by Greenleaf to George Simpson, in trust, for the security of Edward Fox ; the deed by which said assignment was made being commonly known as the " 391 deed."

On the same day, viz., September 30th 1796, Greenleaf executed another deed to the said George Simpson, in trust, reciting, *inter alia*, the facts just mentioned, and declaring it to be his, Greenleaf's, intention, that all persons holding or interested in said orders, notes or engagements, should have the full benefit of the securities which he had received from said Morris and Nicholson or either of them. This last-mentioned deed is commonly called the " 381 deed."  The present accountant is the substituted trustee thereunder, and the present fund for distribution belongs to the trust created by the deed.  The deed in question transfers to said Simpson all and singular the lands, tenements, hereditaments and property, and estate, both real and personal, therein mentioned, to have been received by him, the said Greenleaf, as a security for the said orders, notes, and engagements of said Morris and Nicholson, or either of them, together with the deeds and writings touching the same, and all appurtenances of every kind to the same belonging; including shares of stock in the North American Land Company, agreed to be delivered by Morris and Nicholson to Greenleaf to secure their notes or obligations, all to be held by said Simpson, in trust upon the non-payment of any of said orders, notes or engagements, on the request

of any of the holders of said notes or engagements, to sell the property conveyed by the deed, and apply the proceeds thereof to the discharge of the said notes, orders or engagements.

The drafts of Morris and Nicholson were not paid, and the shares were never transferred to them. On the 8th day of March 1797, James Greenleaf, by sixteen several assignments, bearing date on that day, conveyed to Henry Pratt, Thomas Willing Francis, John Miller, Jr., John Ashley and Jacob Baker, successors to George Simpson as trustees under the " 381 deed," the shares specified in said assignments respectively, including the 10,000 shares sold to Morris and Nicholson, subject to the conditions and appropriations made and contained in the " 381 deed."

Of the shares referred to in these sixteen assignments only 6119 were transferred to Pratt and others, the trustees of the " 381 trust" by the agents of Greenleaf.

Subsequently, on the 26th day of June 1797, an indenture of four parts was made by and between James Greenleaf, of the first part, Edward Fox, of the second part, Morris and Nicholson, of the third part, and Pratt, Francis, Miller, Ashley and Baker, of the fourth part. This indenture recites that Pratt and others, parties of the fourth part, are possessed of notes and acceptances of Morris and Nicholson in favor of Greenleaf, which they hold in trust for certain creditors of Greenleaf, or which they purchased for the use of the trusts reposed in them under assignment from George Simpson, therein referred to, and for the better securing the debts therein intended to be secured, conveys certain property therein mentioned to said Pratt and others, in order that with the property theretofore conveyed, one aggregate fund may be constituted for the security of said indebtedness in the manner therein more particularly mentioned. In this deed Morris and Nicholson agreed that their notes and acceptances therein mentioned and enumerated in a schedule attached to the deed, should " be considered as real, bonâ fide debts of them the said Robert Morris and John Nicholson jointly and severally, without any plea of defalcation or set-off, either in law or equity, and that all securities of every kind heretofore given by them or either of them, for the securing the payment of the said notes and acceptances, or any of them, are hereby confirmed and made good and valid to all intents and purposes, so far as the same relates to the said notes and acceptances and no further." The schedule attached to said deed enumerates notes and acceptances amounting to $831,500. This last-mentioned deed is known as " The Aggregate Fund Deed."

The present accountant is the successor of the original trustee under the " 381 deed." The fund in hand is, as above stated, the proceeds of 6119 shares of stock of the North American Land Company, which have been judicially awarded to this trust, and to tne immediate predecessor of the accountant as trustee, upon a state of

[North American Land Co.'s Estate.]

facts which has been judicially ascertained. The books, papers, exhibits, evidence and testimony generally, before the auditor of the first account of the North American Land Company, and reported by him to the court, and appearing in the printed paper books of that case, have been used and referred to by counsel with like effect as if given in evidence anew in the present hearing. The immediate question in the present reference is therefore solely one of distribution.

On behalf of the Pennsylvania Company for Insurance on Lives and Granting Annuities, successor of James Dundas, deceased, late trustee of the Aggregate Fund, claim was made for such portion of the fund in hand as should be found applicable to the payment of the following notes and drafts belonging to that trust, viz.:—

List annexed to aggregate Fund Deed.

## List " A."

| Item No. 13. | 4 Notes of J. Nicholson to J. Greenleaf, 21st Dec. 1795, 9 mos., $5000 each | $20,000 |
|---|---|---|
| 15. | 1    "         "         "   "   "   " | 5,000 |
| 17. | 5    "         "         "   " 12 "   " | 25,000 |
| 19. | 9    "         "         "   " 15   "   " | 45,000 |
| | | $95,000 |
| 12. | 4 Notes R. Morris to J. Greenleaf, 21st Dec. 1795, 9 mos., $5000 each | $20,000 |
| 14. | 1    "     "         "     "   "   " | 5,000 |
| 16. | 5    "     "         "     " 12 "   " | 25,000 |
| 18. | 5    "     "         "     " 15 "   " | 25,000 |
| | Total included in Schedule " E" of " 381 Trust," | $75,000 |
| 24. | 1 Note J. Nicholson to J. Greenleaf, due 12th Aug. 1796, 100 shares Bank U. S., value | $52,000 |
| 25. | 1    "         "    12th Oct. 1796    "         " | 52,000 |
| | Total included in Schedule " F" of " 381 Trust," | $104,000 |
| 1. | 11 Acceptances of R. Morris, 28th May 1796, 2 years, $5000 each | $55,000 |
| 2. | 1    "         "         2   "   "   " | 2,500 |
| 3. | 15    "         "         3   "   "   " | 75,000 |
| 4. | 13    "         "         4   "   "   " | 65,000 |
| 5. | 1    "         "   ____   "   " | 2,500 |
| 6. | 15    "    J. Nicholson, 2 years,   "   " | 75,000 |
| 7. | 1    "         "   ____   "   " | 2,500 |
| 8. | 16    "         "   3 years,   "   " | 80,000 |
| 9. | 2    "         "   4   "   "   " | 10,000 |
| 20. | 14    " Morris to Nicholson, 1 year,   "   " | 70,000 |
| 21. | 15    " Nicholson to Morris, 1   "   "   " | 75,000 |
| 22. | 4    "     "         "   2   "   "   " | 20,000 |
| | Total included in Schedule " G" of " 381 Trust," | $532,500 |

The notes and drafts mentioned in the foregoing list " A" are a

2 Norris—32

[North American Land Co.'s Estate.]

portion of those secured by shares in the North American Land Company, specified in schedules D., E., F. and G. of the 381 deed, the particular notes and drafts applicable to each schedule being as stated in the above list. They also form part of the $831,500 of notes and acceptances referred to in the Aggregate Fund Deed, a list of which was annexed to that instrument.

All of the drafts of May 28th 1796, in the list above mentioned, amounting in the whole to $532,500, were produced at the audit by the counsel of the claimant; but of the $95,000, of the notes of Nicholson to Greenleaf, dated December 21st 1795, therein mentioned, four only, of $5000 each [being the 13th item on the Aggregate Fund Deed list], in all $20,000, were produced, while of the $75,000 of notes of same date, of Morris to Greenleaf, four only, of $5000 each [being the 12th item of the Aggregate Fund Deed list], in all $20,000, were produced. The last two notes in said list, for United States Bank shares, valued at $52,000 each, total $104,000, were also produced, thus making the entire amount of original notes and drafts produced $676,500. Mr. Tilghman, the counsel, stated that he had no recollection of having ever seen, and had been unable to find among the papers of the Aggregate Fund Trust, the missing notes for $129,500, and that of those produced, $145,000 had been found by him on the 9th of June 1848, by mere accident, among the papers of the late Edward Tilghman, Esq., the original counsel [in 1797] of the trustees of the Aggregate Fund. He contended before the auditor, however, that sufficient proof of the title of the Aggregate Fund Trust to the whole $806,500 of notes, above mentioned, was furnished by the deed of June 26th 1797, creating that trust, and that the admission of that fact therein made by Morris and Nicholson, as well as by Greenleaf, was at least primâ facie evidence of such title at the present time, and rendered the production of the notes unnecessary.

The auditor, however, was of a different opinion, and that nothing short of regular secondary evidence establishing the actual loss of the notes should be relied on as a substitute for their production. He accordingly entertained the claim of the Aggregate Fund Trust to the extent of $676,500 of notes given in evidence, and rejected it as respects the $129,500 of notes not produced or accounted for.

The claim thus made in behalf of the Aggregate Fund was opposed by Messrs. Lawrence and Ingersoll, who made the following claims :—

"1. Greenleaf must make good to Morris and Nicholson the 10,000 shares he sold them, or restore to them their drafts.

"2. He must pay to them the $25,000 he agreed to pay [contained in articles of agreement between Greenleaf, Morris and Nicholson, above mentioned], with interest, less credit of amount received by Mr. Morris, $4738.

[North American Land Co.'s Estate.]

" 3. the trustee must account for the difference between 6119 and 10,000 shares."

The auditor's conclusions were :—

"Morris and Nicholson are parties to the Aggregate Fund Deed, and they therein and thereby declare that the notes and acceptances referred to in that deed as being held by Pratt and others, the trustees, and enumerated in the schedule attached thereto, 'shall be considered as real and bonâ fide debts of the said Robert Morris and John Nicholson, jointly and severally;' and all securities given by them or either of them for securing the payment of said notes and acceptances, or either of them, are thereby ' confirmed and made good and valid to all intents and purposes, so far as relates to the said notes and acceptances and no further.'

" As between Morris and Nicholson on the one hand, and the trustees on the other, this is a conclusive admission that the trustees are the holders of the notes and acceptances in question, so that as against the representatives of Morris and Nicholson the title is to be regarded as in the trustees.

" The various views pressed on behalf of the estates of Morris and Nicholson seem to begin or terminate in what substantially amounts to a claim of performance by Morris and Nicholson of the terms of the articles of agreement of sale between them and Greenleaf.

" In Moss's Appeal and Halsey's Appeal, 7 Wright 23, the Supreme Court has determined what was the legal relation to each other of the parties in that transaction. ' The only equitable right,' it is said, ' which Morris and Nicholson could have to demand the stock must have arisen out of payment.   Nothing less could ever have entitled them to specific performance.   In fact they never did pay.   It is not pretended that they did, unless indirectly through what is called the Aggregate Fund Deed, and after a careful investigation we have been unable to discover any evidence that the drafts were ever actually paid or in any manner satisfied.'

" The evidence in the present reference is the same as that before the Supreme Court as to which the above opinion was expressed.

"As Morris and Nicholson, in the Aggregate Fund Deed, admitted the title to the drafts and acceptances in question to be in the trustees as against themselves, and as their position was analogous to that of complainants in a bill for specific performance, which would require payment on their part in order to give them an equitable standing, and it is asserted by themselves in the Aggregate Fund Deed that those are bonâ fide debts, and it appears by the evidence, and has been judicially declared, that ' they never did pay,' the auditor believed it his duty to disallow the claim made in their behalf.

" On the other hand, the auditor allows the claim in behalf of the Aggregate Fund Trust, and it remains to consider in what man-

[North American Land Co.'s Estate.]

ner the balance for distribution is applicable to the various classes of the notes and drafts above referred to. It is clear from the terms of the '381 deed' that the collaterals mentioned in each of its several schedules are a security only for the notes and acceptances mentioned in that schedule, or in other words, that the notes specified in one schedule are not secured by the collaterals mentioned in another.

" The present fund arises exclusively from 6119 shares of the North American Land Company, being only a portion of such shares mentioned as collaterals in the aforesaid schedules D., E., F. and G., and of the claims entertained and allowed by the auditor, as above mentioned.

| $20,000 | are for notes secured by shares referred to in schedule D. |
| 20,000 | "  "  "  "  "  "  "  E. |
| 104,000 | "  "  "  "  "  "  "  F. |
| 532,500 | "  "  "  "  "  "  "  G. |

" It accordingly becomes necessary to ascertain in what way the 6119 shares from which the fund is derived should be divided among the above-mentioned schedules. On this subject it appears to be established, that of the 6119 shares in question, 4970 shares appertain exclusively to schedule G. That schedule embraced the whole of Greenleaf's original interest in the land company, which consisted nominally of 10,000 shares. Of these, however, 2545 shares were never issued, the land which they were to represent never having been conveyed to the company, and 2485 shares were at the time of issue deposited as security for dividends, and by a decree of this court, affirmed by the Supreme Court, are to be regarded as the property of the company, and therefore as merged. These reductions reduce the number of shares actually issued to or on behalf of Greenleaf to 4970.

" The identity of 3869 of the 6119 shares with Greenleaf's original shares is quite evident. They consist of the 791 transferred by G. Simpson, and 500 transferred by W. T. Franklin, the 1130 transferred by Bird, Savage & Bird, 500 of the 1700 transferred by S. Bourne, and the 948 by assignment by transfer, No. 15 of those dated March 8th 1797, from Greenleaf—total 3869. The remaining 1101 shares of the 4970 are derived from 1200, the balance of the 1700 above mentioned as transferred by S. Bourne. It appears from page 16 of the North American Land Company's journal, that of the entire 1800 shares, which on March 10th 1795 had been issued to Bourne, 600 each by Morris, Nicholson and Greenleaf, respectively, to hold in trust for them, Morris and Nicholson had equitably assigned their 1200 to Greenleaf, and recognised them as his property. From the nature of the transaction it is probable that this may be regarded as an exchange or loan of shares, and hence that so many of those shares as are needed for the purpose, to wit, 1101 shares, should be regarded as having

[North American Land Co.'s Estate.]

taken the place of Greenleaf's original shares.   The auditor accordingly finds that schedule G. is to be considered as embracing such part of the fund as has been derived from 4970 shares of the North American Land Company.   In regard to the other schedules, D., E. and F., the effort made to identify the particular shares embraced by them, respectively, has not been successful, and under such circumstances the auditor accordingly proposes to divide the 1149 shares among them, in the proportion of the amount of notes embraced by each to the whole amount embraced by all.   Such division appears, however, to be of little, if any, practical importance as regards the present distribution, inasmuch as all the notes above mentioned, as allowed to come in upon all the said schedules, are presented by the same claimant.

"The auditor accordingly awarded to 'The Pennsylvania Company for Insurance on Lives and Granting Annuities,' substituted trustee of the estate known as the Aggregate Fund, appointed by the honorable court on the 23d day of December 1865, in the place of James Dundas, deceassd, trustee, the following sums, viz. :—

"1.  On account of the amount due on the above-mentioned notes for $20,000, secured by schedule D., the sum of   .   .   .   .   .   .   $2304.80
2.  On account of the amount due on the above-mentioned notes for $20,000, secured by schedule E., the sum of   .   .   .   .   .   .   1809.44
3.  On account of the amount due on the above-mentioned notes for $104,000, secured by schedule F., the sum of   .   .   .   .   .   .   3790.88
4.  On account of the amount due on the above-mentioned notes for $532,500, secured by schedule D., the sum of   .   .   .   .   .   .   34,193.60

$42,098.72"

Exceptions were filed to the report of the auditor, but before argument in the court below, the decision reported in 10 P. F. Smith 247 was made, reversing the former decision as to the liability of Morris and Nicholson under the 6 per cent. guaranty-covenant.   Upon the suggestion of counsel, the court below remitted the report to the auditor, " to enable parties supposed to be affected by the decision of the Supreme Court to be heard, without the court expressing any opinion upon the question whether the rights of the exceptants are affected by said decision."   Under this order the auditor made a special report.   After discussing the extent of the special order, he reports :—

" The subject of present investigation being therefore regarded as restricted to an inquiry into the import and effect of the decision

[North American Land Co.'s Estate.]

in 10 P. F. Smith, page 247, &c., it accordingly becomes necessary
. to examine that case, and to ascertain as clearly as possible what it
is that is therein adjudicated. This may, perhaps, become more
evident by a brief reference to some antecedent matters.

" The matter came before the Supreme Court in 1862, in Moss's
Appeal and Halsey's Appeal, reported in 7 Wright 23. In that
case the court treat the six per cent. guaranty of Morris, Nicholson
and Greenleaf as imposing ' an annually recurring obligation, an
obligation as long-lived as the association itself,' and as being ' a
fundamental regulation for distribution, an organic law of the asso-
ciation, stamped upon the deed of settlement by the founders them-
selves.' It was there held that as Morris, Nicholson and Greenleaf
claimed under the articles of the association, which included the six
per cent. guaranty, they were bound thereby, and that ' by no act
of theirs can they deprive those who obtained certificates from them
of the right to receive out of the funds of the company the divi-
dends which the fundamental articles assured.' The preceding case
was a review, upon appeal, of the report of the auditor upon the
first account of the trustees of the North American Land Com-
pany.

" Subsequently, in 1862, the report of the auditor upon the
second account of the surviving trustee of the same company came
before the Supreme Court upon appeal, and is reported and decided
in 10 P. F. Smith 247, &c., being the case referred to in the order
of court, and the immediate occasion of the present inquiry under.
said order. In this connection it may be observed, that it is one
of the facts in the history of these transactions, that the affairs of
the North American Land Company, shortly after its organization,
became so much embarrassed that it was found necessary to modify
the original articles of association. Alterations of those articles,
or supplementary articles, were accordingly proposed, and were
adopted in 1807, by more than the required two-thirds vote of the
stockholders, and on April 27th 1808, the trustees under the orig-
inal articles conveyed the lands held under those articles to the
managers appointed under the supplementary articles. The details
connected with this reorganization of the company, or alteration of
its articles of association, formed a part of the evidence before the
auditor of the first account of the trustees of the land company,
and the same evidence was before the Supreme Court when the
report upon that account was reviewed and passed upon in 7 Wright
23. It should be added, also, that the same evidence was before
the present auditor when he audited and reported upon the account
of the trustees of the 381 trust.

" In the matter of the audit of the second account of the trustees
of the land company, it appears from the reporter's statement of
the case in 10 P. F. Smith, p. 254, that after the argument in the
Supreme Court upon the exceptions to the auditor's report upon

[North American Land Co.'s Estate.]

said second account had taken place, the report was recommitted to the auditor, to examine and report to that court 'what effect, if any, the adoption of the supplementary articles had on the 23d article,' viz., the articles containing the six per cent. guaranty or covenant. The auditor made a special report in pursuance of that order, and stated his conclusions to be, that the adoption of the supplementary or additional articles had the legal effect, not only of releasing all claim against the covenantors under the six per cent. guaranty, for default in the past, but of annulling or extinguishing the covenant itself. This view was adopted by the Supreme Court. The special report of the auditor was confirmed, and the case was recommitted to him to make distribution. The effect of the supplementary articles upon the twenty-third of the original articles, which contained the six per cent. covenant, appears to be the only subject which is considered and adjudicated in the case in 10 P. F. Smith 247, and no reference is made in the opinion of the court to the opinion in the prior case in 7 Wright 23.

" Having thus endeavored to ascertain the nature of the decision of the Supreme Court in 10 P. F. Smith 247, the next inquiry that arises relates to the effect of the decision upon the report of the present auditor as heretofore made. That report set forth a distribution of a fund which by the case in 7 Wright 23 had been judicially awarded by the Supreme Court to the '381 trust.' The claims that were made upon the fund, during that audit, in behalf of the respective estates of Morris and Nicholson, are stated and set forth in the report.

" Those claims were overruled, and the balance of the fund, after certain deductions, was awarded to the substituted trustee of the Aggregate Fund.

" The learned judge, in delivering the opinion of the Supreme Court, in 7 Wright 23, states that there are four principal classes of questions in the case, and these, as enumerated on page 29 of the report, are first, What rights, if any, were by the articles of association secured to the other shareholders as against Morris, Nicholson and Greenleaf? The second relates to the claims of Morris and Nicholson as creditors. The third question is, Into how many shares the fund for distribution is to be divided? And the fourth relates to the ownership of the shares.

" These questions are discussed separately and consecutively in the opinion. As respects the first of these inquiries, the court evidently treat the six per cent. covenant as having an effective legal bearing upon the point under consideration, as giving rights to the other shareholders as against the covenantors and their representatives, and as postponing in the distribution the shares of stock held by Morris, Nicholson and Greenleaf, until the other shareholders have received their arrears of the guaranteed six per cent. dividend. This part of the ruling of the Supreme Court appears by the

perusal of it to be based upon a view of the six per cent. clause, which seems to have been subsequently abandoned in 10 P. F. Smith 247.

"The remaining question of the four above mentioned relates to the ownership of the shares upon which the dividend was to be made, and it is this part of the opinion of the court which more immediately concerns the present reference.   On page 31 the court takes up the subject of the claim of the ' 381 trust' to 6119 shares. This claim was opposed by the appellants (the representatives of Robert Morris and John Nicholson, respectively), who claimed that the shares above mentioned, which stood in the name of the ' 381 trust,' in reality belonged to them, the appellants.   It is stated by the court that ' the appellants rest their title upon articles of agreement made on the 28th day of May 1796, between Greenleaf of the one part, and Morris and Nicholson of the other.   By these articles it was agreed that Greenleaf should sell to Morris and Nicholson his whole interest in the North American Land Company, consisting of 10,000 shares, for the sum of $1,150,000, payable one-half in drafts of Morris on Nicholson, accepted by him, and the other half in drafts drawn by Nicholson on Morris, and accepted.   The drafts were made payable in one, two, three, and four years from date. The articles stipulated that the stock agreed to be sold should not be transferred, but should be retained by Greenleaf until the drafts should mature and be paid, with a proviso that on the payment of a part, a proportional part of the stock should be transferred.'

"It will be seen from the foregoing language employed by the court, that the appellant's claim of title was based upon the articles of agreement dated May 28th 1796.   The court in construing those articles decide expressly that they do not amount to a legal transfer of the shares, but that they constituted, at most, an executory agreement, of which the appellants were in effect asking a decree for specific performance.   After thus stating the general nature and character of the appellant's claim, the court say, that as the agreement of Greenleaf to transfer the stock was executory, the only equitable right which Morris and Nicholson could have to demand the stock, must have arisen out of the payment of the drafts, and that nothing less could have entitled them to specific performance. Thereupon it is expressly said by the court that it is not pretended that they did pay, unless indirectly through what is called the Aggregate Fund Deed.   The conclusion stated by the court is, that after a careful investigation they have been unable to discover any evidence that the drafts were ever actually paid, or in any manner satisfied, and that evidence of actual payment of the acceptances utterly fails.   This is the ground upon which the decision of this part of the case is based by the court, and it will be seen that it contains no reference whatever to the six per cent. covenant, and that said covenant does not in any way appear to constitute an

element in the adjudication of the court. It is true, that after this statement of facts and expression of opinion, the court ask what it would avail Morris and Nicholson, even if it were conceded that they were in a position to ask specific performance in their favor ? In connection with this inquiry, the opinion of the court proceeds to say : ' the entire dividend on the 6119 shares would be absorbed in the debts due by them to the company, and in the claims of the other shareholders under the six per cent. guaranty, and still these debts and claims would be far from satisfied; in no aspect of the case, therefore, can a dividend upon those shares be made to the appellants.'

" The auditor understands this language of the court as meaning, firstly, that under the construction given to the articles of agreement of May 28th 1796, by which they were held to be executory in their nature, and in view of the default of Morris and Nicholson in payment of the acceptances, which were the consideration thereof, their representatives had no valid claim to a dividend ; secondly, that even if this were conceded to be otherwise, it would not practically avail Morris and Nicholson, because the six per cent. covenant, and their debts to the company, would absorb the dividend ; and thirdly, the conclusion is, that in no one of these two aspects of the case can a dividend upon the shares in question be made to the appellants.

" The inquiry by the court as to how far it would avail Morris and Nicholson, even if it were conceded that the prior reasons given for overruling their claim of title were erroneous, appears to be a cumulative consideration, which is merely adverted to by the court as a matter affecting the result in case the decision were otherwise, and not brought forward as a basis of the decision. Or if it be regarded as a case in which two distinct and independent reasons for the judgment are assigned by the court, and it is expressly asserted that either of them is of itself amply sufficient to sustain the judgment, it cannot certainly be contended with success that the entire judgment falls, because subsequently one of those reasons is pronounced to be inadequate. The auditor cannot avoid the conclusion that in discussing and deciding the claim of title made in behalf of Morris and Nicholson to the 6119 shares, the existence or operation of the six per cent. covenant does not appear by the language of the court to have constituted an element of the actual *ratio decidendi ;* and he is therefore unable to say that the decision upon the question of title, and the award made to the ' 381 trust' in 7 Wright 23, would have been otherwise, even if the same view of the six per cent. covenant had been taken in that case which was subsequently taken in 10 P. F. Smith 247. The auditor is also unable to say that the case in 10 P. F. Smith 247, should have the effect of modifying the report as heretofore made by him. The passage in that report, in which the claims of Morris and Nicholson are referred to and dis-

posed of, has been already quoted in full, in order that it may appear that the six per cent. covenant is not an element which is taken into consideration in reaching the conclusions there stated. It is not even mentioned or referred to in connection with that part of the report, as contributory in any respect to the reaching of those conclusions. That there has been a change in the view taken by the Supreme Court touching the six per cent. covenant, does not seem to be seriously disputed by any of the counsel. But the auditor is of opinion, as respects this part of the case, that such change of view does not affect the construction of the agreement of May 28th 1796, or the deductions from the evidence, in pursuance of which the Supreme Court, in 7 Wright 23, established the title of the ' 381 trust' to the shares in question, as against the claims of title made in behalf of the representatives of Morris and Nicholson, and that consequently that title and those claims should stand in the position in which they were placed by the case in 7 Wright 23, notwithstanding the subsequent decision in 10 P. F. Smith 247."

Exceptions were filed on behalf of the representatives of Morris and Nicholson. The court below dismissed the exceptions and confirmed the original and special reports, Allison, P. J., delivering the opinion. After stating the history of the case and the provisions of the different deeds of trust, he says :—

" To the conclusion of the auditor awarding the fund in the hands of the accountants to the Aggregate Fund Trust, exception is taken on various grounds, and by different parties. Much stress is laid on the clause of the Aggregate Fund Deed which excludes the ' 381 deed' and property therein mentioned from the operation of the Aggregate Fund Deed; but as we have seen, by quoting the express objects to be accomplished by the creation of the latter trust to what it applied, this clause can be regarded in no other light than as guarding, by express terms of exclusion, the ' 381 deed' from all benefit of the trust created by the Aggregate Fund Deed. It is no more than declaring that the property set apart in the Aggregate Fund Deed, for certain specified objects, wholly separate and distinct from those which the ' 381 trust' was created to secure, shall not be applied to the ' 381 trust.' The mistake of the exceptants, under this head of objection, is in supposing that such is the effect of the award of the auditor, which is founded solely on the fact that the trustees under the Aggregate Fund Trust are the legal holders of the notes and acceptances produced by them, to secure the payment of which the 6119 shares of stock were set apart by Greenleaf. For whose benefit they hold is another question, which can hereafter be raised at the proper time and in the proper forum. No presumption of payment of these notes arises from the fact that they are in the hands of the present accountants, who are trustees of the Aggregate Fund Trust. This position is fully answered by the restatement of the fact that when the Aggregate Fund Deed was executed, Morris

and Nicholson recognised the existence of the notes as well as their entire obligation to pay the same, and that they were, as to. the holders, the predecessors of the present accountants, wholly without defence.

"It is also contended, against the report, that certain of the exceptants have had no day in court, the auditor, J. A. Phillips, having dismissed their claim for want of jurisdiction, holding that the proper time to present it would be on the settlement of the present account of the '381 trust.' The report of auditor Phillips was confirmed by the Court of Common Pleas, and this it is now contended has left them without a hearing upon the merits. But the whole case, including the voluminous testimony taken before the auditor, went up to the Supreme Court, and was fully considered in Moss's Appeal and Halsey's Appeal, 7 Wright 23. No one who reads the lengthy and well-considered opinion in that case can doubt that it was considered in the court upon its merits; it is decided on no technical ground, but on the broad principle that the present exceptants are without merit, that they have no standing as claimants for proceeds of 6119 shares of stock until they prove actual payment of the notes, and this the Supreme Court say they have not done. The contract of May 28th 1796 is held to be not a sale absolute for notes, with a pledge of the shares as security, but an executory contract to sell, and is incapable of any other construction. The power of the Supreme Court to go into the merits of the questions as to which the auditor and court below had decided they were without jurisdiction, is denied; and all that that court have said, under this head, in Halsey's Appeal, is characterized as mere *obiter dictum*. We are invited, in the argument submitted, to hold that the Supreme Court having no jurisdiction, its decision of the '381 trust' is neither conclusive in law nor in fact, and is *coram non judice*. To sustain this doctrine, counsel has cited Frantz v. Brown, 17 S. & R. 292; Schuylkill County's Appeal, 2 Wright 459; Jones v. Jones, 2 Jones 355. But we do not feel free to adopt this suggestion, and thus disregard the decision of the Supreme Court, and hold that it 'can have no judicial weight with this court in now deciding the question.' We prefer that the tribunal which decided Halsey's Appeal should themselves first adopt this view, if the reasoning pressed upon our consideration be well grounded.

"Several positions were taken before the auditor by the counsel representing Halsey, administrator *d. b. n.* of John Nicholson, deceased, which are stated by the auditor in his report to be: 1. Greenleaf, represented by the accountants, must make good to Morris and Nicholson the 10,000 shares which he sold to them, or restore to them their drafts. 2. He must pay them the $25,000 which he agreed to pay by the articles of May 28th 1796, the same under which he agreed to sell all his interest to Morris and Nicholson in the land company for $1,150,000, less $4738. 3. The

[North American Land Co.'s Estate.]

trustee must account for the difference between 6119 and 10,000 shares. The auditor does not in his report reply in detail to these several positions taken in behalf of the administrator of John Nicholson, deceased, but says the various views pressed on behalf of Morris and Nicholson seem to begin and terminate in what substantially amounts to a claim of performance by them of the terms of the articles of agreement of sale between them and Greenleaf. But that there had not been performance was settled in Halsey's Appeal, and there has been no attempt to show the contrary in point of fact up to this time; all subsequent effort, if such has been made, has brought no fact to the front which even tends to show actual payment, and the Supreme Court have said that to set up a presumption of payment will not suffice. In further support of the views of this exceptant, an equitable ground is assumed; that Greenleaf, having taken to himself the benefit of the $1,150,000 of notes, those claiming under him should be postponed to the claim of Morris and Nicholson, who have never derived one cent of profit from what they thus bought and paid for. But what did they pay? Promises which they never fulfilled; worth up to this hour to the holders just the value of the several pieces of paper on which they are written.

" The answer to this position of this exceptant is, that if Morris and Nicholson claim an equitable enforcement of the agreement with Greenleaf they must first do equity. There can be no enforcement of specific performance till the party asking relief shows performance, or the tender of it, on his part. This is what the Supreme Court has already settled in this case as applicable to this very demand; recognising the justice of this decision, we have neither the disposition nor the power to dispute or overthrow it. It stands in the way of this exceptant, so that he cannot advance a single step in furtherance of either of his propositions until he removes this barrier. To every demand which he may make, until this is done, the conclusive answer is, that as a condition precedent to the enforcement of a transfer of stock to you, you promised to pay your notes and engagements, and this you have not done; and the express agreement further was, that James Greenleaf was not to transfer until you did pay. Neither does the resulting trust, in favor of Morris and Nicholson, become effective until the notes which the stock was assigned to protect have been paid.

" The auditor recognises the claim of the trustees of the Aggregate Fund Deed as the holders of $676,500 of the notes produced by them, and rejects the claim set up by said trustees to other notes amounting to $129,000, because they were neither produced nor shown to be in the actual or constructive possession of the claimants. In this, we think, he decided correctly; the recognition of these $129,500 of notes in the deed of June 26th 1797 does not of itself show title in the trustees of that deed.

[North American Land Co.'s Estate.]

" We cannot sustain the exceptions filed by certain shareholders in the North American Land Company, represented by Mr. Waln. The exception is, that the whole fund should have been awarded to the shareholders of said company, and not to the trustees of the Aggregate Fund Trust; but if we understand the grounds upon which this claim is based, it is that the conditions on which the '381 trust' was executed, never having been complied with, the property did not pass under the deed, and it should go to the shareholders other than Morris and Nicholson, under the decision of the Supreme Court in Halsey's Appeal, 7 Wright 23, as to the effect of the covenant of guarantee. If this is the basis on which this claim rests, the decision in 10 P. F. Smith 247, which swept away this covenant, would seem to take from this claim all the support it ever possessed.

" But the alleged non-execution of the '381 trust' cannot avail to set that trust aside as far as Morris and Nicholson are concerned, and reinstate them in the position in which they stood before the '381 deed' was executed. They subsequently became parties to the Aggregate Fund Deed, which recognises the existence at that date of the '381 deed,' and the appropriation of property therein mentioned to the uses of that trust. It is too late to raise such a question as this after actual and presumed ratification by Morris and Nicholson, or to hold, that by reason of an assumed non-execution of that trust, Morris and Nicholson, though reinstated, are to be postponed to the other shareholders of the company.

" These are all the questions which present themselves upon the first report of the auditor on the '381 trust.' When they were first called for argument, and, indeed, after the argument had somewhat progressed, it was suggested that an appeal was pending in the Supreme Court upon exceptions to the decision of the Common Pleas upon the report of John M. Collins, Esq., auditor appointed to distribute the balance appearing on the second account of James Dundas, surviving trustee of the North American Land Company. It was agreed to by counsel, that the exceptions should stand over until the decision of the Supreme Court should be made. After that decision had been announced, which is reported in Ingersoll's and Dales's Appeal, 10 P. F. Smith 247, the following order was made : 'It is ordered that this report (upon which we have just remarked) be remitted to the auditor, to enable parties supposed to be affected by the decision of the Supreme Court, to be heard, &c., without the court expressing any opinion upon the question whether the rights of the exceptants are affected by said decision.' The whole case then went back to the present auditor, which opened before him for argument the questions upon which he had originally passed. The auditor, however, upon the making up of his second report, correctly construes the order of reference as raising before him the question intended by the court, namely, to inquire and de-

termine whether or not, if the decision in 10 P. F. Smith 247 had been made before the conclusion of the audit, or the filing of his report, it would have had such legal bearing upon the subject before the auditor as to require a modification of the conclusions as stated, or the award as made by him.    Resting on this conclusion, the auditor proceeded to examine Ingersoll's and Dales's Appeal, in order to ascertain what it is that is therein adjudicated, so as to reach a conclusion as to the effect of that decision upon the award which he had made in his first report.

" Under the original articles of association, whereby the company was constituted in 1795, the founders, as previously stated, agree that the dividends of the company shall not be less than six per cent. per annum in every year; for the payment of which they made, as they supposed, ample provision, and made themselves personally responsible to make good any deficiency arising from the sales of land to secure the payment of the dividend of six per cent. to the shareholders.    In Moss's and Halsey's Appeal, 7 Wright 23, the Supreme Court, in 1862, decided that this guarantee imposed an annually recurring obligation as long-lived as the association itself; that as it was a fundamental article of the association, constituting a part of the original contract between the founders of the company and the shareholders, it was not avoided by long disuse and non-claim.    In Ingersoll's and Dales's Appeal, the court held that the agreement organizing the company provided for a change in the articles, which was afterwards duly and properly made, and that the pledgors were not bound unless it clearly appeared that they had agreed to do so, to transfer or carry over into the organization as changed their original guarantee.

"The power to effect a change in the articles of association, and the fact that they were materially changed by a vote of the shareholders, was overlooked by the court in Halsey's Appeal, 7 Wright 23, and it was there held, that as Morris and Nicholson claimed under the original fundamental articles which included the six per cent. guarantee, they were bound thereby, and that by no act of theirs could they deprive those who obtained certificates from them of the right to receive out of the funds of the company the dividends which those articles assured to them.

" This six per cent. guarantee clause having afterwards been decided to have no present standing in the case, the question presented itself in what manner does the last decision of the Supreme Court affect the questions which arose upon the report of the auditor under the ' 381 trust ?'    The auditor makes reply to this inquiry, by saying that it nowhere appears in his report that in determining between the respective claims of Morris and Nicholson on the one hand, and the Aggregate Fund on the other hand, he was influenced by any considerations connected with the existence or non-existence or effect of the six per cent. guarantee clause.    An examination of

the report fully sustained this assertion. Nor does the opinion of 7 Wright 23 rest upon this clause of the original agreement, but upon the fact of not having paid the notes and acceptances given to Greenleaf, who, by the articles of sale of his interest in the company to Morris and Nicholson, was to retain his stock as security for the payment of the notes, and who afterwards assigned all his interest to secure his creditors. Until payment was shown, the resulting interest of Morris and Nicholson could not be made available to them, and indeed that they had no right or interest in the shares which they had agreed to purchase from Greenleaf until they paid their notes.

" The agreement was but executory, with no right to call upon Greenleaf to transfer his interest in the company until they had complied with their obligation, and paid the notes and acceptances, which were the consideration for the agreement on the part of Greenleaf to transfer his stock. The court add to this statement the conclusion that if the difficulty of which they had treated was out of the way, and upon which the decision rests, namely, an entire want of equitable or legal right, growing out of the fact that the notes still remained unpaid to the assignees of Greenleaf, it still would not avail to carry the stock to Morris and Nicholson, because the entire dividend on the 6119 shares would be absorbed by debts due by them to the company, and in the claims of other shareholders under the six per cent. guarantee. This was but the statement of a fact which the court held would arise to defeat the claim of Morris and Nicholson, if the ground on which the decision is based was out of the way. It becomes unimportant, therefore, to this cause that the original six per cent. covenant would no longer avail to defeat the claim of Morris and Nicholson, unless the first and more material objection, non-payment of the notes, be also shown to be a mistake in fact or in law. If payment can even now be shown this difficulty will disappear, and Morris and Nicholson, resurrected in the persons of their legal representatives, will take the fund in controversy, but they cannot be allowed to take it on the mere presumption of payment, growing out of the lapse of time ; for to allow this would be, as the court say in Halsey's Appeal, to present the case of a chancellor, moved to decree specific performance of one who had not complied with his engagements, but had remained quiescent until he had been discharged by lapse of time. The significant question is then asked, Was ever such a foundation for an equity successfully set up ?

" For the reasons stated, we agreed with the auditor that the change of view taken of the six per cent. guarantee by the Supreme Court does not affect the construction of the agreement of May 28th 1796, or the deductions from the evidence, in pursuance of which that court, in 7 Wright 23, established the title of the ' 381 trust' to the shares in question, as against the claim of title made in behalf

[North American Land Co.'s Estate.]

of the representatives of Morris and Nicholson.   Thus holding, we dismiss the exceptions and confirm both reports of the auditor."

The assignments of error were for dismissing the exceptions and confirming these reports.

*Charles Henry Hart* and *Edward Ingersoll*, for appellant, Henry Phillips, Jr., administrator, &c., of Robert Morris.

*William J. McElroy* and *Benjamin Harris Brewster*, for Edward S. Lawrence, administrator of John Nicholson, deceased, the other of the appellants.

*E. Spencer Miller* and *William M. Tilghman*, for appellee.

Mr. Justice SHARSWOOD delivered the opinion of the court, May 7th 1877.

The question presented on these appeals is one of distribution. The fund to be distributed arises from the proceeds of 6119 shares of stock of the North American Land Company.   This fund it is not disputed has been raised under the trusts of a certain deed of September 30th 1796, James Greenleaf to George Simpson, recorded at Philadelphia in Deed Book No. 55, p. 381, and therefore called the " 381 trust," to distinguish it from another trust under a deed of the same date between the same parties recorded in the same book at page 391.   The first mentioned, or " 381 deed," recites several conveyances by Robert Morris and John Nicholson to George Simpson, to secure the payment of orders drawn by them and endorsed by James Greenleaf in several classes, and recites also that James Greenleaf was desirous "that all persons holding or interested in said orders, notes or engagements should have the full benefit of the securities mentioned."   The trust is, " that any of the said orders, notes or engagements, being due and unsatisfied," the trustee, on the request of the holder or James Greenleaf, should make sale of the property conveyed, and that as soon as all the said notes, orders and engagements shall be paid and satisfied, then to reconvey to James Greenleaf.   It is clear that the holders of said notes and engagements are the *cestuis que trustent* to whom the fund is to be distributed.

The appellees, to whom the fund was awarded in the court below, are the successors of Henry Pratt *et al.*, to whom James Greenleaf, Edward Fox, Robert Morris and John Nicholson, by deed dated June 26th 1797, conveyed certain property to form an Aggregate Fund, in trust (after certain provisions not now material), to pay all the notes, endorsements, and other engagements made by Edward Fox for or on account of James Greenleaf, amounting with interest to about $900,000, for which Robert Morris and John Nicholson were to give their obligations, and also to pay the trustees for cer-

tain notes and acceptances which they had purchased for the use of the trusts of the "391 deed," $4725. George Simpson, the grantee in the "391 deed," on the 23d of March 1797, conveyed to the same persons, the trustees of the Aggregate Fund, all the real estate, notes and acceptances, held by him under that deed, in trust, to secure Edward Fox. Attached to the Aggregate Fund Deed is a schedule containing a list of notes and acceptances of Robert Morris and John Nicholson, amounting to $831,500. Morris and Nicholson were to give their obligations for the payment of these notes and acceptances, payable one-half on the 26th of December 1798, and the other half on the 26th of December 1799. Then follows a covenant in these words: "The said Robert Morris and John Nicholson, and each of them, agree to and with the said Henry Pratt, Thomas W. Francis, John Miller, Jr., John Ashley and Jacob Baker, and to and with the survivors and survivor of them, and to and with the heirs and assigns of them, and of the survivors and survivor of them, that the several notes and acceptances, hereinbefore mentioned, endorsed by James Greenleaf, and now held as aforesaid by them or any other persons for their use, amounting to $831,500, a particular list of all which notes and acceptances is hereunto annexed, shall be considered as real, bonâ fide debts of them, the said Robert Morris and John Nicholson, jointly and severally, without any plea of defalcation or set-off either in law or equity, and that all securities of every kind heretofore given by them or either of them for the securing the payment of the said notes and acceptances or any of them are hereby confirmed and made good and valid to all intents and purposes, so far as the same relates to the said notes and acceptances and no further."

The appellees, claiming as the trustees under the Aggregate Fund Deed, produced before the auditor notes to the amount of $676,500, identical with those described in the schedule attached to the deed. The question—and it is really the only question—presented on these appeals, is whether they have entitled themselves as bonâ fide holders under the trusts of the "381 deed." The holders of these notes are certainly within the terms of that trust, and unless something has been shown to impeach the primâ facie title arising from mere possession, are entitled to the benefit of it. It was earnestly contended that the appellees could not have rightful possession of them under that deed as trustees, as it contained no words conveying anything but the lands and real estate described in it. This is undoubtedly true. Indeed, that deed expressly recognises the fact that these notes were all then in the possession of these trustees, or of other persons for their use. It is clear that the shares of North American Land Company stock, the proceeds of which constitute the fund in court, did not pass by that deed. They were already vested in the trustee under the "381 deed." The trustee under that deed was no party to the Aggregate Fund

2 Norris—33

Deed, and to preclude all question, it expressly declares that the "381 deed" and "property therein mentioned is not included herein, nor influenced in any degree, nor forms any part of this indenture." It will be observed that all the property which was conveyed by Greenleaf to Simpson by the "381 deed" was property of Morris and Nicholson, pledged by them to Greenleaf for the security of his acceptances, as specified in the several schedules attached to that deed. On the other hand, the property conveyed by the "391 deed" to Simpson was exclusively property of Greenleaf. Morris and Nicholson were no parties to that deed. All that property, as we have seen, had been conveyed by Simpson to the same gentlemen, who were made trustees under the Aggregate Fund Deed, and as that deed was a conveyance of a large amount of property belonging to Morris and Nicholson, this, with the property of Greenleaf, already transferred to them, constituted what was properly called an "Aggregate Fund," intended more especially for the security of Edward Fox. Hence the Aggregate Fund Deed provides that "the whole property hereby conveyed by the said Robert Morris and John Nicholson, either jointly or severally, together with all the real estates and the legal and equitable interests and titles thereto heretofore conveyed and assigned to the said Henry Pratt *et al.* by any or all of the hereinbefore mentioned indentures, shall form and be considered as one aggregate fund."

In addition to the notes and acceptances included in the "391 deed," it is recited that the trustees, Henry Pratt *et al.*, "are possessed of other notes and acceptances of them, the said Robert Morris and John Nicholson, and of each of them separately, which are made payable to and endorsed by the said James Greenleaf, which they hold in trust for certain creditors of James Greenleaf, and are also possessed of other notes or acceptances of them separately, which are made payable to and endorsed by the said James Greenleaf, which they purchased for the use of the trusts in them reposed by the said indenture from George Simpson." The deed sebsequently proceeds to provide that the trustees shall be reimbursed $4725, money paid by them for these last-mentioned acceptances and notes. Yet these very notes seem included in the general words of the covenant before referred to, "the several notes and acceptances hereinbefore mentioned, endorsed by James Greenleaf, and now held as aforesaid by them or any other persons for their use." No list of the notes thus purchased was in evidence, and the counsel on both sides say that they are not aware of the existence of any such list, nor of evidence from which such a list could be made out. I conjectured at one time that the $145,000 found by mere accident among the papers of Edward Tilghman, the original counsel of the trustees of the Aggregate Fund, might have been these notes, but the conclusive answer to this or the suggestion that having been cancelled (as it would certainly seem that they ought to have been),

they were the $129,500 not produced, is that all these notes are in the schedule and recognised as existing debts of Morris and Nicholson.

We return then to the covenant. Had it been a mere recognition of the existence and bona fides of these notes in the possession of the trustees, there would be very great force in the contention that they were recognised merely as claims on the Aggregate Fund, which the trustees of that fund were thereby authorized to apply to their payment. With such a construction of the covenant it would be entirely congruous to hold, that the notes were paid and extinguished as claims against Morris and Nicholson, their bonds and the Aggregate Fund being appropriated to their payment, and the trustees, as holders, and those who surrendered to them and took certificates agreeing to look only to the bonds and the fund. A creditor may undoubtedly accept a collateral without giving up his original claim, but if he surrenders the evidence of that claim and takes a new security, the presumption is the other way. It is impossible, however, to give such a restricted construction to the covenant in question. Its language is too broad and comprehensive, and there is no reason why full effect should not be given to it as against Morris and Nicholson or those claiming under them. "All securities of every kind heretofore given by them, or either of them, for the securing the payment of the said notes and acceptances, or any of them, are hereby confirmed and made good and valid to all intents and purposes, so far as the same relates to the said notes and acceptances and no further." This certainly was not the language of men whose intention was to limit the security of the notes to the bonds and the Aggregate Fund. That there were other securities then existing, particularly the shares of North American Land Company stock, which had been pledged by Morris and Nicholson for the payment of these and other liabilities, and which were then held under the "381 trust" for that purpose, is a position beyond all controversy. Why then shall not these notes, thus recognised distinctly as secured, be entitled to the proceeds of these land shares? It is maintained with great zeal and earnestness by the able counsel of the appellants, that they are precluded by that clause of the Aggregate Fund Deed before adverted to, which declares that the "381 deed" and property therein mentioned is not included therein, nor influenced in any degree, nor forms any part of that indenture. These words seem to have been inserted *ex majori cautela*. The property vested in the "381 trust" could not, if they had wished to do so, been made a part of the Aggregate Fund. The trusts of the "381 deed" were for all holders of notes and acceptances of Morris and Nicholson which had been endorsed by Greenleaf, as well those upon which Fox had become liable as others. George Simpson, the grantee of that deed, or any assignee from him, was no party to the Aggregate Fund Deed. Undoubtedly the holders of the $617,500

[North American Land Co.'s Estate.]

notes, not scheduled in that deed, would be entitled to come in *pro rata* with the $532,500 on the 4970 shares which the auditor finds to appertain to schedule G.—the $1,150,000 for which the interest of Greenleaf was purchased by Morris and Nicholson—and to secure the payment of which the legal title remained in him by the agreement of May 28th 1796, and which he transferred to George Simpson by the "381 deed." Morris and Nicholson would not have been estopped by their covenant from contesting the validity of those $617,500 notes, or the bona fides of the holders, as they are as to the scheduled notes. But surely there is nothing in all this to shut out the $532,500 notes from their right to claim. Nor can it be pretended that the non-production of the $617,500 gives the representatives of Morris and Nicholson any right in law or equity to stand in the shoes of the holders, much less to insist upon the exclusion of the scheduled notes as to which they had expressly covenanted that all securities of every kind theretofore given should be good and valid.

The great aim of Morris and Nicholson evidently was, as honest and honorable men, to appropriate their property for the payment of their notes and acceptances in the hands of bonâ fide holders. Whatever may have been their defence as against Greenleaf, they surrendered it as far as the scheduled notes were concerned as to the trustees, whom they recognised to be bonâ fide holders. It is evident that at this late day we cannot understand all the circumstances of the case so as to feel sure of doing entire justice between the parties. It is not improbable that many of these notes were bought in the market for merely nominal sums. Three cents on the dollar is reported by the auditor to have been about their market price in 1797. It is better for us to rest on the conclusion that the parties understood their case much better than we can now do, and to give effect to their agreement according to its plain language.

Decree affirmed ; the costs of this appeal, including the printing of the paper-books of all parties, and a fee of one hundred dollars to each of the counsel of the appellants, to be paid from the fund.